Good morning, Your Honor. May it please the Court, my name is Kevin Bringell, and I represent the defendant appellant, Edgar Tolentino. Mr. Tolentino, as the Court knows, was convicted after a trial that we contend continues several significant errors. I'd like to discuss three of them here. There were five in the briefs, and I'd like to use my time to discuss three of them. First is the District Court's error in permitting the government to introduce testimony and argument regarding the structure and motive of drug smuggling operations, organizations. It's undisputed that this occurred and that it was precluded in limine upon this Court's string of cases, starting with Vallejo, McGowan, Pineda-Torres, and Varela-Rivera, that under Rule 403 it was more prejudicial than probative. It's undisputed that the government nonetheless introduced the testimony as well as some argument. The government's excuse for why this is permissible is that the defense opened the door. And they pointed to two other cases primarily from this Court, United States v. Murillo and United States v. Alatorre, both of which are, first of all, teach contrary to the government's contention. Well, it's pretty clear from Vallejo and from, well, it's very clear from Murillo, and it's pretty clear from Vallejo, that if fingerprint, or lack thereof, evidence is gone into, it does open the door. Respectfully, I think it's a little more complicated than that, and I would urge the courts to look closely at Murillo, Alatorre. I have. And here's why I say it's a little more complicated than that. If you look at Murillo, it says two things. Number one, you have to look at not only whether the door is open, but how far. What did the defense do to open the door? How far did they open it? Well, your argument, I think, is that what happened was that the government went too far by it could and should have just stopped by saying, look, the stuff was in gasoline and I couldn't get good prints off of it. Right? Correct. That's what you say, and so you're saying the error is they went somewhat beyond that and said, and besides, the person who puts the stuff in the tank isn't ever going to be the guy who's driving it across the border. That's one very important aspect of it, and that comes from this Court's decision in United States v. Lim that says whenever the door is open, whatever the government does to rebut it, it's a very narrow exception, and the government can only introduce enough to rebut it. It seems to me in this case the extent of the evidence is way less than in the cases that you're talking about where there was rather extensive discussion of it, and here it seems by comparison rather brief and focused. There are two key differences between this case and Murillo. Number one, I began by saying that Murillo says you have to look at how far did the defense open the door. In Murillo, the Court decided that the defense opened the door wide open. How did they do that? The defense had a fingerprint expert of its own. They designated their own fingerprint expert. You can't open the door wider than that, and that's what the defense did in Murillo. What's the difference? The bottom line is there were no fingerprints. I mean, that's the point. The defense says there are no prints, and so the jury should infer from the fact that there are no prints that the guy who's in the car who's the defendant couldn't possibly have been the one who knew that the stuff was in the car and brought it across the border. It does matter. Respectfully, it does matter because what we're talking about is the government rebutting with evidence that has already been held to be more prejudicial than probative under 403. And the only reason they can introduce it is because the defense has opened the door. And what I'm saying is what Murillo says, what Lynn says is the first thing the Court has to do is look how far did the defense open the door. Murillo, they opened it wide open, I'm saying. They designated their own fingerprint expert. Here we didn't do that. We asked one or two questions. The door is exactly the same. That's my point. Okay. And I'm not hearing you tell me that the door is any different. The door is there are no prints. Okay. Point taken that that's the point the defense was getting at. But I think what Murillo says is you have to look at the amount, the type of evidence that the defense introduced. Here we didn't introduce any positive evidence of our own. All we simply did was ask I think one or two questions on cross-examination. Excuse me, sir, did you have a fingerprint? No. That's about what it was for the defense. Very different than what they did in Murillo. And secondarily, you look at what did the government do to go through the door. In Murillo, essentially, they peeked through the door. The quote there at page 1177, what this court said that the government did there, was that the agent, the testimony that came in for the government in Murillo, did not extrapolate the various roles of people in the drug organizations, nor did the agent imply that Murillo participated in a large-scale operation. So in Murillo, you have the door wide open by the defense, and the government essentially limiting its evidence as much as it can, sort of peeking through, as I say. And I think both things are different here. We did not have our own fingerprint expert. We asked one or two questions on cross simply, and the government instead burst through the door that had been not open nearly as much as Murillo by arguing both the things that they, excuse me, introducing evidence of, testimony of, and arguing in closing things that went far beyond what happened in Murillo. And then the third element, I discussed the United States versus Lim case, and Your Honor already referred to this, which is did the government even need to do it? Did they do more than they needed to to rebut it? And I think that's true. I won't repeat the point Your Honor made, but I think that's very clear. A difference here is that in cases like Alatorre, the drugs were in a, I think it was in a trunk compartment. In Murillo, there was no evidence that fingerprints couldn't have been lifted at all. Counsel, how could this have made any difference? He admitted that he was paid $1,000 to drive these drugs across the border, and he knew they were drugs. So where does this struggle get you? As far as harmlessness goes? Correct. Again, all I can say is that if you look at the cases, and we now have four of them from this court, Vallejo, Pineda-Torres, McGowan, and Varela-Rivera, in which this evidence did come in and was sufficient to reverse, there was, in some of those cases, confessions and similar evidence. Most of these cases, there's really only one issue, knowledge. There are cases where drugs are coming across the border. And he admitted knowledge. Which was challenged. Well, the point is that the veracity of the confession or his post-arrest statements were obviously central to the defense and challenged, because they were internally inconsistent and didn't make sense. I understand he didn't testify. But the statements, the post-arrest statements, that we certainly introduced evidence through their own agent about their internal inconsistencies, as well as some pressure that was given to him that may have caused him to say things that weren't true. So I think in conjunction with that, and again, we looked at United States v. Lim, did the government do more than was necessary? Did the government take evidence that we know is more prejudicial than probative under 403 and use it gratuitously when it didn't need to? So I think if the court's point is they had a lot of other evidence, that actually weighs, in this case, more for the defense than the government. Because they didn't need to introduce the 403 evidence if they thought their case was so strong. Those are the points I wanted to make on that issue, unless there's further questions. The second issue I was hoping to address was whether the district court erred in determining the base offense level at sentencing based on a purported gross weight rather than what the rules of the sentencing guidelines and criminal procedure and the Constitution require, which is Counsel, you or whoever was trying this case suggested to the court that 10 percent was not the right number, that the court should have used 16 or 17, because there were cases that showed that it was as high as 16 or 17 percent. But even if we used those numbers, even if you used 17 percent, he still ends up with the same base offense level. So, again, based on what was argued to the district court, how could there be error? The problem is this, I think, is an issue in which there really is no doubt that there was an error here. There is the district court relied on what it said it saw in many plea agreements in that district, and it seemed to presume that 10 percent was the actual correct. You know what? I've just got to say this. You said it. You said that in your brief. You said it to the district court, and you're saying it now. And the district judge made it very clear that that's not what he was doing. He was giving you the benefit of the doubt by saying I have seen some other plea agreements where it was – where there was a negotiation and they agreed on 10 percent. So I'm just going to give you the benefit of the highest I've ever seen. And I just – you know, I guess my real problem here is that, you know, your brief never starts off by mentioning at all that you brought up the subject of – or the defense brought up the subject of fingerprinting. You have said that the district court incorrectly relied on plea agreements, and neither fact is correct. And, you know, it's just troubling not to be up front about difficulties. Anyway, my point here is that the district court did not rely on other plea agreements to your detriment. I think very respectfully, and the point is well taken, that the district court said verbatim I am not. He certainly did. He did. The problem is in the very next breath, in the next sentence in the transcript, our argument is unfortunately that's exactly what he did. And here's the reason why. What the district court judge was saying was that 10% was essentially the maximum. The problem is that 10% is the minimum. 10% is – I mean, this is the reason. And you told him the maximum was 17%, and it comes out to the same place. And it particularly comes out to the same place when one of these bricks was in evidence, and it would appear from everything that each brick weighed one kilo, and there were 44 of them. So I guess I have – There's no evidence of that. The government never measured it. It's inferential. It's a permissible inference to draw from the physical evidence and the other evidence that was in the case. Or at least I'm suggesting to you that that's a possibility. And I just have difficulty seeing where there's any possible argument on the facts. I think the problem is this. The court has said some things that one would hope or might be reasonable inferences, but they're not from this evidence. We have a picture of – and the court hasn't seen the picture, but there's a picture of bricks of marijuana stacked on a scale, and they're stacked deep. You can only see the front row of bricks, and you can see in the picture that they're not identical. And the government never measured them as far as their physical shape, never measured their weight. We also know that actually what we're looking at when we look at that picture, we're looking at marijuana, we're looking at cellophane packaging, we're looking at grease, and we're looking at, so to speak, at gasoline that was soaked into them. We know that from Agent Amatori that said they were gasoline-soaked, and we know it from the chemist. The packages were gasoline-soaked. Well, the chemist – what the chemist said was she tested core samples, and I said, did the core samples smell like marijuana? She said it smelled like gasoline was her first answer. And I asked her, well, they also smelled like marijuana? And she said, yes, they smelled like gasoline and marijuana. So when we look at the picture of this alleged gross weight, we're looking at three things, marijuana, packaging, and gasoline. And we know that only one of those three things is what we can consider, which is the net weight of the marijuana itself. As far as to answer Your Honor's question with regard to 16% or 17%, I can't recall exactly in the transcript where that is. But the point I was trying to make, and if the government had brought its own evidence, what we would see is that probably the highest net weight reduction certainly I've ever seen in the district is more like 25% to 30%. It depends on the type of packaging. It depends on the amount of packaging. It depends on whether the bricks are identical or not. It depends on all those things. The government in this case, the defense tried to get a preservation order, and ultimately did, but it was too late. They'd already been destroyed. The government didn't mention that at the time, but they were destroyed by the time it got the preservation order. And they didn't physically measure them as far as were the bricks identical, and they didn't take a weight measurement either. There's no evidence of the accuracy of the scale. Speaking of things that aren't mentioned in briefs, the government says that this is a Department of Justice laboratory scale, and that's simply not true. The testimony was to the contrary. This was a scale kept by the Customs Service, not the DOJ. It wasn't at a laboratory. It's in a room at the… Yeah, all of which is apparent from reading the transcript. I mean, the chemist and the guy who did the weighing all testified, all were available for cross-examination. Any of these questions that it was important to bring out could have been brought out. They were. I understand. I've read the transcript. I know what was brought out. But if there was different packaging from cellophane, it could have been brought out. There's no indication here that there was heavy contact paper or anything of that sort. Because the defense never got to see it. My point is that the people who did and who did the weighing were on the stand available for a cross-examination. The question could have been asked, okay, were any of these packages wrapped in anything other than cellophane? Well, the point is, you know, the basic rule for a defense attorney, don't ask in front of the jury a question you don't know the answer to. Because the government destroyed the drugs and also because the question of net weight was not before the jury. That's another important reason why that wasn't inquired into. We asked that that be an element in the jury instructions, knowledge of net weight and knowledge of type. It was denied per the en banc decision in Buckland and Supreme Court decisions. And the jury instructions didn't have the jury consider net weight. Net weight was an irrelevant issue. If that had been a – if I started asking questions about net weight and amount of packaging, it would have been properly injected. You asked – the question about gross weight was asked in front of the jury. Correct. Correct. Okay. All right. And because it wasn't in the jury instructions, number one, the jury didn't pass on the gross weight. And number two, this Court's en banc decision in Buckland says, as well as Velasco-Heredia, which was not en banc, but subsequent to the Buckland en banc, says that the jury's decision, the jury's verdict only tells us the minimum and maximum statutory penalty. It has nothing to do with base offense levels. I sign this one. Okay. Thank you. May I please support Moore Quinn on behalf of the United States? Good morning, Your Honors. With regard to the fingerprint testimony, I think the transcript is clear that it's the defense who opened the door. The judge actually stopped the defense from going into the questions there and explained to him that he would allow the government to elicit the reasons why the fingerprints were not taken. And the government went ahead, and the defense went ahead at that point and decided, even knowing that the court was going to allow that inquiry, he would continue along that line of questioning. The government's questions to the expert witness were very specific. They were narrow. The responses that were elicited were narrow. There was no testimony about marijuana being planted and seized and someone picking it and growing it, being trucked up to the border and repackaged, all that kind of structured evidence. It was specifically to why fingerprints were not taken in this case, and that's because the person who is the driver is not the person who typically packs the substance into the packages and puts it into the vehicle. So it was a very narrow in scope. With regard to the gross weight of marijuana, I think I owe an apology to the court because in the motions that the government filed back in August, which are part of the record but were not provided to the court, the government in those motions gave notice that those motions were filed on August 12th, and in those motions the government stated that the drugs were scheduled to be destroyed on September 10th and asked that they be reweighed within 10 days of the originally scheduled motion hearing, which was August 19th. There was, in fact, a motion hearing on August 19th, and there was no motion at that time heard or brought by the defense for an order for reweigh, and the drugs were subsequently destroyed. So I believe it's disingenuous on the part of the defense to be saying that they didn't have notice and that they should have been weighed. Well, that may be, but there is some burden on the government to demonstrate the weight. That defense can be silent, and if the government says nothing other than here's a stack, guess how much it weighs. That wouldn't do it. And the government believes that we've met that burden by a preponderance of the evidence. And what specifically, in your view, is sufficient beyond estimation or reliance on other cases and just visually seeing that it's cellophane? Well, Your Honor, in this case, the evidence that the judge relied on, specifically at sentencing, was he saw the picture of the marijuana on the scale, and that scale had 48.64 kilograms. So that's the gross weight. There's no dispute that that was the gross weight of the marijuana. On the DEA-7, it talks about, which was admitted into evidence at trial, it talks about these being vacuum-sealed plastic bags. So the bags are, in fact, it's not aluminum foil. It's not some kind of heavier material. And, in fact, there are 44 packages, and there's testimony to that. In addition, at trial, there's a picture of the marijuana in a grocery cart, and that grocery cart is a standard-sized grocery cart, and it's filled three-quarters of the way with these packages. So this is a large amount of marijuana. Well, that's you can't – if all there was was a grocery cart with some stuff in it, I submit that would be inadequate. I agree, Your Honor. But what we have here is we have a grocery cart full of the packages that were taken out of the vehicle. So the argument here is that they were somehow soaked with gasoline, I suppose. But that's not the case. What the case is, is they're vacuum-sealed. These things are packaged by the drug organizations  Can you tell from looking at them whether they're, in your view, whether they're approximately the same size and dimension? The packages? Yes, each brick. I have a picture. I ask that because at some point, and I can't now recall whether it's orally or in writing, but I think it was defense counsel who said that the net weight of one of them was essentially 1.0006 kilograms or something like that. Your Honor, I didn't bring the exact exhibits with me. I have the small pictures that they were blown up from. I marked them as exhibits that the court would like me to. I can show them to you. I don't recall myself looking at them. That's okay. We can look at them later. But they are, in fact – I mean, it's a grocery cart full of 44 packages, three-quarters of the way full. So it's a large amount of marijuana. So did the government give the opportunity for this stuff to be weighed? Yes, it did. It could have been re-weighed, but it wasn't. And it also submitted evidence to how much it weighed. Now, in this case, in order for there to be a downward departure, the plastic would have had to weigh over 8 kilograms. So this is vacuum-sealed plastic. If you took all the stuff out of the packaging, you stack up the plastic, and 8 kilograms is, what, 17 pounds of plastic. That's a huge amount of plastic. So it's inconceivable that, in this case, the judge did not give a benefit to the defendant. In order for there to be a benefit to him, he would have had to depart almost – it was 17.8 percent to get him to the next offense level. And that's not appropriate in this case. What the judge did was say, hey, I see in other cases the government does take into consideration how much the packaging weighs. This is a standard case. It's standard plastic. It's not aluminum foil. It's not some other substance. And I'm going to give you the benefit of what I see. I saw that in the PSR. They were going to give you a benefit of 10 percent. I'm going to give you, even without a plea agreement, that benefit. And that's what the court in this case did. There was a sufficient index of liability. The scale was sufficient. The packaging, the pictures, the judge made the appropriate decision in this case. And there was no clear error. I'll submit it if the court has no further questions. Okay. Thank you. Mr. McGill. Briefly, one essential problem on the net weight of the drugs is that I think the government and the district court, unfortunately, turned the burden of proof around, turned it on its head. It said we're going to start at the purported gross weight, and we're going to look to see if there's any evidence to reduce it. And we know from the sentencing guidelines and the Buckman on Buck opinion that I refer to, and the burden of proof, we're supposed to do the opposite. We're supposed to start at the lowest base offense level permissible under the jury's verdict, which here would have been base offense level six. I think it's fair to say base offense level six is a few grams. There's no way this would have been a base offense level six. And if you look in the record, what I said to the judge is, well, it may not be a base offense level six. Whether it's an 18 or a 20 is a pretty difficult decision. And I think that since the government is the one who destroyed the drugs and they're the one with the burden of proof, I asked the judge to give us a level 18. I wasn't living and trying to live in fantasy land. And then just briefly. Kagan. I think your time has expired. And we appreciate the argument. And the matter just argued will be submitted. And the Court was adjourned. The Court is adjourned. Thank you. Thank you.
judges: Rymer, Graber, Molloy